IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
NOV 29 2004 WH
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| EDITH JONES, et. al., Plaintiffs, | ) | No. 96 C 7717 |
| v. | ) | Judge Mathew F. Kennelly |
| R. R. DONNELLEY & SONS COMPANY, Defendant. | ) | |

**CERTIFICATE OF SERVICE**
**AND NOTICE OF FILING**

DOCKETED
NOV 30 2004

TO: Tom Abram
Richard Schnadig
VEDDER PRICE
222 North LaSalle Street
Suite 2600
Chicago, IL 60601

I, Catherine Caporusso, certify that I filed with the Court and caused to be served a copy of the attached PLAINTIFFS' PETITION FOR ATTORNEY FEES AND COSTS and PETITION FOR INCENTIVE AWARDS upon the above on this 29TH day of November, 2004 via FIRST-CLASS MAIL.

[signature]
Attorney for Plaintiff

H. Candace Gorman
Catherine Caporusso
GORMAN & CAPORUSSO
542 S. Dearborn St., Suite 1060
Chicago, IL 60605
(312) 427-2313

322

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

NOV 2 9 2004 WH

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
NOV 3 0 2004

| | | |
|---|---|---|
| EDITH JONES, et al., | ) | |
| Plaintiffs, | ) | No. 96 C 7717 |
| | ) | Judge Kennelly |
| v. | ) | |
| | ) | |
| R.R. DONNELLEY & SONS, | ) | |
| | ) | |
| Defendant. | ) | |

## PETITION FOR ATTORNEYS FEES AND COSTS

NOW COME the Plaintiffs, by and through their attorneys, and ask this Court to grant this petition for attorney's fees and costs in the amount of one third of the common fund.

This case was filed in November 1996 shortly after Plaintiffs' counsel received certain discovery materials in *Gerlib v. R.R. Donnelley*, the age discrimination and ERISA class action filed against the Defendant. The discovery showed the systematic discrimination against African-Americans in the shutdown of the Chicago Manufacturing Division in 1993. After conducting legal research regarding the timeliness of the claims, and interviewing CMD employees, Plaintiffs' counsel filed a complaint under 42 U.S.C. Sec. 1981(b) on behalf of a group of former employees and seeking class certification for all African-American CMD employees. (Ex. A)

At the time of the filing of the complaint, Plaintiffs' counsel knew that the statute of limitations under Illinois' personal injury statute was two years and that the Plaintiffs' claims were more than two years old. Despite this fact, Plaintiffs' counsel determined that she would take the case on a contingent basis. It was her intent to change the statute

328

of limitation for cases filed under 42 USC § 1981 after the 1991 Civil Rights Act to the four year federal "catch all" statute of limitations under 28 U.S.C. § 1658, and obtain compensation for the terminated CMD employees. (*Id.*)

From the day this case was filed to the day this case was settled, Defendant repeatedly and relentlessly sought to have the Plaintiffs' claims dismissed on statute of limitations grounds. Defendant filed multiple motions to dismiss and motions for summary judgment against the Plaintiffs on the grounds of timeliness, and vigorously fought class certification. In order to support their motion for class certification and to resist Defendant's motions to dismiss under equitable estoppel, equitable tolling, and continuing violation theories, Plaintiffs' counsel served multiple discovery requests, and were then required to file multiple motions to compel because of Defendant's repeated refusals to provide adequate responses.

It took over two years of litigation over discovery and other related issues before the Defendant's motion for summary judgment was fully briefed. Then, in February 1999, Magistrate Judge Levin recommended that the Defendant's motion be granted, rejecting Plaintiffs' arguments under the continuing violation theory, equitable estoppel, equitable tolling, and the four year statute of limitations established by 28 U.S.C. § 1658. Plaintiffs filed objections to that recommendation, and in August 1999, Judge Williams denied the Defendant's motion on the grounds that Plaintiff had established a genuine issue of material fact on the equitable estoppel and equitable tolling arguments. Defendant then filed a motion to reconsider, which was denied. Plaintiffs continued to seek more discovery through motions to compel, and the case was then transferred to this Court in early 2000.

After over a year of further litigation, in April 2001, this Court certified a class of approximately 600 African-American former CMD employees, including three subclasses: 1) those who were terminated during the CMD shutdown; 2) those discriminated against in their status/classification; and 3) those subjected to racial harassment. When the Defendant sought to file yet another motion for summary judgment on the equitable estoppel and equitable tolling issue, this Court ruled, after more briefing, that the Plaintiffs' claims were timely under the Sec. 1658 four-year statute of limitations. Defendant then sought an appeal to the Seventh Circuit, and won a decision in their favor. Plaintiffs' counsel attempted a petition for rehearing *en banc* (which was denied) and then a petition for writ of certiorari to the U.S. Supreme Court, which was granted in May of 2003.

After the U.S. Supreme Court decided to take the case, legal and civil rights organizations, business groups, and attorneys general from across the country became involved in the litigation through the submission of *amicus curiae* briefs. The U.S. Solicitor General's office submitted a brief in support of the Plaintiffs' position and Plaintiffs' counsel ceded 10 of her 30 minutes to the Solicitor General so that they too could orally argue before the U.S. Supreme Court on behalf of the Plaintiffs' position. Plaintiffs' counsel worked steadily for many months to prepare for the argument, which took place in February of 2004.

On May 3rd, 2004, Plaintiffs' counsel won a unanimous Supreme Court victory for the Plaintiffs, with the Court holding that the statute of limitations for Section 1981(b) claims was four years. This case will forever have an impact on Section 1981(b) cases across the country, lengthening the statute of limitations for Plaintiffs in almost every

state. *See, Donoghue v. Doherty,* 124 S. Ct. 2157 (5/17/2004); *White v. BFI Waste Serv.,* 375 F.3d 288 (4th Cir. 2004); *James v. Circuit City Inc.,* 370 F.3d 417 (4th Cir. 2004); *Harvey v. Maytag Corp.,* 2004 U.S. App. LEXIS 15408 (7th Cir. 2004); *Collins v. Norris,* 2004 U.S. App. LEXIS 10768 (7th Cir. 2004); *Dandy v. United Parcel Service Inc.,* 2004 U.S. App. LEXIS 22525 (7th Cir. 2004); *Jackson v. Homechoice Inc.,* 368 F.3d 997 (8th Cir. 2004); *Fonseca v. Sysco Food Services,* 374 F.3d 840 (9th Cir. 2004); *Love v. Pinnacle Nissan Inc.,* 2004 U.S. App. LEXIS 12418 (9th Cir. 2004); *Thinket Ink Info. Res. Inc., v. Sun Microsystems, Inc.,* 368 F.3d 1053 (9th Cir. 2004); *Cooper v. Southern Co.,* 2004 U.S. App. LEXIS 23495 (11th Cir. 2004); *Lakshman v. University of Maine,* 2004 U.S. Dist. LEXIS 15579 (D. Maine 2004); *Nicholls v. Brookdale University Hosp.,* 2004 U.S. Dist LEXIS 12816 (E.D. N.Y. 2004); *Davis v. Am. Soc. Civ. Eng.,* 2004 U.S. Dist LEXIS 16010 (E.D. Va. 2004); *Whitehead v. Chevron USA Inc.,* 2004 U.S. Dist. LEXIS 10542 (N.D. Tex. 2004); *Nicol v. Lavin,* 2004 U.S. Dist. LEXIS 16060 (N.D. Ill. 2004); *Patterson v. County of Cook,* 2004 U.S. Dist LEXIS 12178 (N.D. Ill. 2004); *Pruitt v. City of Chicago,* 2004 U.S. Dist LEXIS 9103 (N.D. Ill. 2004); *Smith v. Aaron's Inc.,* 2004 U.S. Dist. LEXIS 12559 (E.D. La. 2004); *Chugh v. Western Inventory Services, Inc.,* 333 F.Supp.3d 285 (D.N.J. 2004); *Thomas v. New York City Health,* 2004 U.S.Dist. LEXIS 17694 (S.D. N.Y. 2004); *Sleigh v. Charlex, Inc.* 2004 U.S. Dist. LEXIS 19118 (S.D. N.Y. 2004); *Bill v. Berkley United School District,* 2004 U.S. Dist. LEXIS 19527 (N.D. Cal. 2004). It will also have an impact in areas far outside of employment law, whenever a cause of action arises under an Act of Congress enacted after 28 U.S.C. § 1658, particularly in cases under the Telecommunications Act

of 1996 and the Uniformed Services Employment and Reemployment Rights Act of 1994. See, *MCI Tel. Corp. v. Illinois Bell,* 1998 WL 156674 (N.D. Ill. Mar. 31, 1998), *E. Spire Communications Inc. v. Baca;* 2003 WL 21537806 (D.N.M., June 12, 2003), *Verizon Maryland v. RCN Telecom Service,* 232 F.Supp.2d 539 (D.Md. 2002), *Rogers v. City of San Antonio,* 2003 WL 1566502 (W.D. Tex., Mar. 4, 2003), and *Akhdary v. City Of Chattanooga,* 2002 WL 32060140 (E.D. Tenn., May 22, 2002).

Consistent with its previous actions, even after the Supreme Court decision, the Defendant indicated that it would again try to have some of the Plaintiffs' claims dismissed on timeliness grounds and again threatened numerous Summary Judgment motions. However, shortly after the Plaintiffs won the Supreme Court victory, the Defendant agreed for the first time to participate in mediation for the CMD race claims. Plaintiffs submitted a twenty-five page memorandum to the mediator, outlining the theories and damages of the Plaintiff class, and after lengthy negotiations, the case was settled for a total of $15,000,000. The settlement was a "common fund" settlement, that is, Class Counsel's efforts produced a common fund of money for the benefit of the plaintiffs with whom they had contingent fee agreements, but also hundreds of class members with whom they did not have contractual arrangements. Herbert Newberg & Alba Conte, *Newberg on Class Actions,* § 14.6 at 546-547 (2002).

At the time that the case settled, Class Counsel had amassed a mountain of evidence that the Defendant had engaged in systematic discrimination against African-American employees, through written discovery, computer analysis, depositions, and interviews with plaintiffs. That evidence included statistical evidence regarding racial disparities in transfers to other divisions during the CMD shutdown, as well as testimony

from Plaintiffs who were told during the shutdown that there were no positions available at other divisions. Plaintiffs would have been able to demonstrate that Donnelley was not committed to equality, diversity, and the fair treatment of its African American employees.

As the Court noted in its decision on the motion for class certification, nearly 25% of white CMD employees transferred to other divisions, but "only a handful" of African-American CMD employees transferred. Plaintiffs had submitted evidence indicating that unlike the white employees who actually were transferred the handful of African American employees who the company said were "transferred" actually had to locate the jobs on their own, that the jobs they obtained were "temporary" jobs and/or at reduced wages, and they lost seniority and benefits. The statistical likelihood that this racial disparity was due to chance was similar to the odds of one person winning a world lottery three times in a row when every living person had bought a ticket. Plaintiffs' Counsel also amassed evidence regarding the thousands of open positions at other divisions for which the Plaintiffs were qualified.

Plaintiffs also presented statistical evidence regarding Defendant's practice of keeping its African-American employees in non-permanent positions with no benefits. As this Court recognized in the class certification ruling, there were persons who were employed in the CMD as "temporary" employees for upwards of twenty years, and the evidence indicated that African-Americans comprised 99% of the non-permanent workforce at the CMD, which is highly statistically significant, and that the non-permanent employees formed well over half of the total African-American workforce at the CMD. Plaintiffs' Counsel had also gathered testimony from many employees

regarding their attempts to achieve permanent status, including being laid off when they got close to meeting the criteria for permanent employment. The evidence supporting the Plaintiffs on their status/classification claims was "so clear" that the Court certified a separate subclass of CMD non-regular employees on its own motion.[1] Plaintiffs had also submitted testimony regarding being subjected to ongoing racial harassment and hostility, including segregated locker rooms, racial epithets by supervisors, and graffiti showing African-Americans being lynched.

This compelling evidence in support of Plaintiffs' claims and driving the Defendant towards settlement was not compiled by an army of attorneys at a big law firm, with a staff of paralegals and other support staff, but through thousands of hours of work by a small number of attorneys, communicating with class members, pouring through thousands of documents, and working with computer databases.

As this Court is aware, this case at one time was expanded and consolidated with another case, *Adams v. R.R. Donnelley,* which involved race discrimination and harassment at other R.R. Donnelley divisions. The claims of non-CMD employees were settled last year, and Class Counsel received an award of fees and costs for their work in that case. The fees and costs now requested by Plaintiffs' counsel do not include anything that they have previously been compensated for in either the *Adams* or the *Gerlib* class actions. Class Counsel have made a good-faith effort to exclude hours that were excessive, redundant or otherwise unnecessary, and certify that these fees are accurate, reasonable and necessarily incurred in the prosecution of this case.

---

[1] Plaintiffs had sought a nationwide subclass for non-regular employees, which this Court rejected, instead certifying a subclass of CMD non-regular employees.

The Declarations of H. Candace Gorman, (Ex. A) Catherine Caporusso, (Ex. B) establish that the litigation and negotiation of this case over the last eight years involved the expenditure of 11,700 hours of attorney time, and 3090 hours of law clerk and paralegal time. Out-of pocket costs expended by the Plaintiffs' counsel to date are over $125,000. (An itemization of hours is available upon request). In addition, Donnelley was unwilling to pay the costs for administering the settlement of this case, and those costs will be born by Class Counsel. Administration of the *Gerlib* settlement resulted in hundreds of hours of both attorney time and paralegal time, in tracking down current addresses, and in dealing with the heirs, potential heirs, wannabe heirs and estates of the numerous Plaintiffs and class members who had died. (Ex. A)

Applying the reasonable rates detailed in the declarations, the fee lodestar, including expenses and without any enhancement or multiplier, is $4,756,636.00. Class Counsel now seek $5,000,000, one-third of the Settlement Common Fund, which is permitted by the contingency agreements signed by the named Plaintiffs as well as the parties' Stipulation, for their fees and expenses incurred to date as well as fees and expenses associated with claims administration. The notice sent out to the Plaintiffs and Class members advised them of Plaintiffs' counsel's request for an attorney fee in the amount of one-third, and not one Plaintiff or Class Member has objected to that fee.

The requested award of fees is consistent with the law involving class action settlements, as it is fair, adequate, and reasonable. The factors to be considered in class action fee awards, whether measured by a percentage of the common fund approach, or the lodestar approach, include the time and labor expended by counsel; the degree of success obtained; the magnitude, complexities, and difficulties of the litigation; the

preclusion of employment by the Plaintiffs' attorneys due to acceptance of the case; the risk of the litigation, the quality of the representation and the legal skills required, the requested fee in relation to the settlement, the contingency fee nature of the case; the customary fee, the market rate, and awards in similar cases; and public policy considerations. *Mathur v. Bd. Of Trustees,* 317 F.3d 738, n. 1 (7th Cir. 2003); *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974); Herbert Newberg & Alba Conte, *Newberg on Class Actions,* § 14.6.

**A. The Time and Labor Expended by Class Counsel and the Preclusion of Other Employment**

From the time Class Counsel started investigating this case through the present, Class Counsel and Defendant's counsel litigated this case vigorously and unrelentingly in front of several district court judges, two magistrate judges, the Seventh Circuit, and the U.S Supreme Court. The need to match the efforts of Defendant's counsel required extensive time and labor. Ms. Gorman alone has dedicated over 8500 hours to this matter over the past eight years, requiring that she litigate this matter to the exclusion of others in which she might have engaged. Ms. Caporusso has dedicated almost 2000 hours to the case over a period of seven years, also precluding her from working on other litigation. (Exs. A, B) In sum, the time and labor expended by Class Counsel over an eight-year period has been extensive and overwhelming. As of October 21st, 2004, there were three hundred and twenty filings in the court record for this case.

**B. The Magnitude, Complexities, and Difficulties of the Litigation**

Employment discrimination class actions are typically both factually and legally complex and difficult, and this case was more complicated and difficult than most. Class

Counsel worked with a large class and a substantial statute of limitations issue, reviewed tens of thousands of pages of documents and thousands of lines of computer data, took and defended dozens of depositions, and interviewed hundreds of witnesses. Counsel prepared a computer database of many of the documents that were not available in electronic form. Counsel then worked with statistical experts to analyze the assembled data, which included information on the thousands of open positions at other Donnelly divisions. Counsel prepared and responded to many discovery requests, including preparing individual responses from the named Plaintiffs. Counsel performed the legal research for and prepared numerous memoranda analyzing the many factual and legal issues in the case. To give just one example of the challenge of this case, at one point in that research, as a part of the Supreme Court litigation, Class Counsel reviewed a summary of every law passed by the Congress over a period of thirteen years. Counsel responded to or filed dozens of motions relating to class certification, discovery, and other issues. They survived many attempts to have the case dismissed, which required lengthy briefing in front of one magistrate judge and two district court judges, and after years of litigation, realized a rarely obtained, unanimous decision from the U.S. Supreme Court. Settlement was reached in this case only after almost a decade of hard work by a very small number of attorneys on a very difficult case. Given the complexity of the case, the time simply spent on preparation for the mediation itself was substantial.

**C. The Risk of the Litigation**

Courts recognize that the riskier the case, the greater the justification for a substantial fee award. The riskiness of a case must be assessed as of the commencement of representation, not sometime later when developments in the litigation made nonpayment more or less risky. *In Re Synthroid Marketing Litigation,* 264 F.3d 712,

718-719 (7th Cir. 2001); *Florin v. Nationsbank,* 34 F.3d 560, 565 (7th Cir. 1994). Employment discrimination class actions are particularly risky. The difference in risk between these cases and many other types of class actions, including antitrust, securities fraud, and consumer product class actions, is highlighted by the small number of employment attorneys willing to take them on. Many lawyers are afraid of the risks taken on by the Class Counsel in this case, and Plaintiffs would have faced great difficulty in finding another lawyer who would have agreed to take the case. (Ex. C, affidavit of Michael Mulder, Ex. D, affidavit of Robin Potter, Ex. E, affidavit of Fay Clayton) Even this Court commented on May 24th, 2000 in the *Gerlib* case that the prospect of a class action half the size of this one would have a "chilling effect" on Plaintiffs' lawyers due to the scope and difficulty of discovery.

Among employment discrimination class actions, this case was especially risky at the time that Class Counsel agreed to represent the Plaintiffs. When Class Counsel decided to take on the case, Counsel understood that the claims were more than two years old, and that the recognized statute of limitations for Sec. 1981 claims in Illinois was two years. Plaintiffs' counsel was aware of an untested theory that could enlarge the statute of limitations to four years, and despite the fact that only two district courts and no circuit court had addressed the issue at the time of the filing, Plaintiffs' counsel believed the theory was a valid interpretation of the law, and along with the other theories advanced in the litigation including equitable estoppel and equitable tolling, Plaintiffs' counsel decided to take the risk. (Ex. A) There was also a likelihood that the Court would not certify a class, or that the class size would be smaller than Class Counsel sought, either at the certification stage or later on summary judgment. At the outset, Plaintiffs' counsel

knew that the case would be extremely costly and would require expensive expert analysis after obtaining discovery from Defendant, which could prove to be a significant challenge. Plaintiffs' counsel was also faced with the prospect of going up against a well-financed opponent with a capable and experienced counsel from a law firm with hundreds of attorneys and legal professionals.

Despite these odds, counsel risked thousands of hours of attorney time and out-of pocket costs to vigorously litigate this case on an exclusively contingent basis, which was a major risk for a sole practitioner. (Ms. Caporusso was not hired by Ms. Gorman until a year after this case was filed, see Ex. B). Counsel did not have other clients at the firm who could support them through paying cases, as they take almost all of their cases on a strictly contingency basis. Had Class Counsel lost on statute of limitations grounds, or the motion for class certification, or on summary judgment, or at trial, these results would have had a very serious impact on Class Counsel's firm. This supports both the percentage of the common fund requested, as well as an enhancement of the lodestar. Counsel should be compensated for taking on such a substantial risk of non-payment. *In Re Synthroid Marketing Litigation,* 264 F.3d 712, 718-719 (7th Cir. 2001); *Florin v. Nationsbank,* 34 F.3d 560, 565 (7th Cir. 1994).

**D. The Quality of the Representation, Skills Required, and Results**

Class Counsel are highly skilled, experienced, and determined employment discrimination and civil rights attorneys. Ms. Gorman has practiced law for more than twenty years and has a national reputation as an outstanding and hardworking plaintiffs' attorney who takes on risky cases against the country's largest companies. She has served in the leadership of many legal organizations and committees and has given many presentations and written many papers on the subject of employment litigation. She is

regularly contacted and consulted by lawyers across the country as an expert in employment litigation. Both she and Ms. Caporusso worked on the *amicus* brief for the National Employment Lawyers Association in the *Burlington Industries v. Ellerth*, *Faragher v. City of Boca Raton*, and *Pollard v. DuPont* Supreme Court cases, which were resolved in the plaintiffs' favor. Ms. Caporusso is a Harvard Law School graduate, a well-known political activist who is often asked to speak on civil rights issues, and currently teaches a course on the Supreme Court for University of Illinois at Chicago Honors College. She, like Ms. Gorman, has a reputation as an exceptional and driven plaintiffs' attorney. (Exs. A-G)

Class Counsel was so committed to the four-year statute of limitations theory that they assisted other plaintiffs' counsel in other circuits with legal research and briefs in order to advance the theory. (Ex. H) After the *Zubi v. AT&T*, 219 F.3d 220 (3rd Cir. 2000) split decision was reached, Class Counsel also helped the plaintiffs' attorneys in that case with their motion for reconsideration and *en banc* petition. (Ex. A)

Class Counsel have vigorously litigated on behalf of the case over a period of many years, took this case all the way to the Supreme Court on the statute of limitations issue, and won, unanimously. They did so despite the vociferous and persistent opposition presented by Defendant's experienced and knowledgeable counsel. This opposition included one of the most well-regarded and experienced Supreme Court litigators in the United States, who was specially hired by Defendant just for the oral argument, had argued forty-two cases in front of the Supreme Court, and had been ranked as one of the top 100 lawyers in the country by the National Law Journal.

The case that Class Counsel won has an impact on every single Section 1981 case filed in this country, and they obtained significant compensation for their clients. Class Counsel have also secured favorable settlements in the *Gerlib* ERISA class action and on behalf of the *Adams* race discrimination class action against the same Defendant, and have obtained substantial relief in many other multi- and single plaintiff employment and civil rights cases. (Exs. A-G)

**E. Market Rate, Customary Fee, and Awards in Similar Cases**

The first and best benchmark for establishing the appropriate rate in a particular case is the terms of actual fee agreements between counsel and individual class members prior to the initiation of the litigation. *In Re Synthroid Marketing Litigation,* 264 F.3d at 719. Here, Class Counsel entered into one-third contingency fee arrangements with the named Plaintiffs, which demonstrates that these Plaintiffs and Plaintiffs in similar cases are willing to pay such an amount. (Ex. A) In addition, as discussed above, no class members have objected to the requested fees and costs, which were specified in the Class Notice. This should carry substantial weight, because frequently, class members do object to attorney fee awards. See, e.g., *Vizcaino v. Microsoft Corp.,* 2002 U.S. App. LEXIS 9188, at *4 (May 15, 2002) (approving fees of about $27 million despite objections from two class members to the amount); *Mangone v. First USA Bank,* 206 F.R.D. 222, 236 n.3 (S.D. Ill. 2001) (approving settlement but addressing objections to attorneys' fees in a separate opinion). The absence of objections indicates that class members accept the proposed fee and cost allocation and that the request is reasonable.

Plaintiffs have also attached the affidavits of Fay Clayton, Robin Potter, and Michael Mulder, who have extensive experience representing parties in class action

litigation. They all attest to the customary nature of the one-third percentage, given the complexity of the issues involved in this litigation, the associated risks, the quality and experience of class counsel, and the costs and expenses advanced on a contingent basis. (Exhibits C, D, and E; *see also* Exhibit H)

The case law and awards in other common fund cases supports this percentage as well. Herbert Newberg & Alba Conte, *Newberg on Class Actions*, § 14.06 at 551 ("empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery"). See also, e.g., *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) ("most suits for damages in this country are handled on the plaintiff's side on a contingent-fee basis" and "[t]he typical contingent fee is between 33 and 40 percent"); *Teamsters v. Inter-Rail Transport,* 2004 U.S.Dist. LEXIS 6363 (N.D.Ill. 2004) (fee awards in class actions are commonly one third of settlement); *Cullen v. Whitman,* 197 F.R.D. 136, 147 (E.D. Pa. 2000) (awarding one-third of common fund); *Retsky v. Price Waterhouse,* 2001 U.S.Dist. LEXIS 20397 (N.D.Ill. 2001) (same); *Goldsmith v. Technology Solutions,* 1995 U.S.Dist. LEXIS 15093 at *26 (N.D.Ill. 1995) ("courts in this District commonly award attorneys' fees equal to approximately one-third or more of the recovery," and collecting cases); *Spicer v. Chicago Bd. Options Exchange,* 844 F. Supp. 1226, 1252 (N.D.Ill. 1993) (collecting cases); *Mister v. Illinois Central Gulf Railroad Co.*, No. 81-3006 (S.D.Ill. Aug 5th, 1993) (awarding 40% of a common fund of $10 million).

**F. Public Policy Considerations**

This case represents the paradigm for a class action: individuals banded together to bring a suit that required far too much time and expense for any individual or small

group of individuals, with the goal of both securing compensation for the Plaintiffs' injuries as well as deterring the company from continuing its practices of race discrimination and harassment. Congress and the Courts have repeatedly recognized the strong public interest in the enforcement of civil rights and anti-discrimination laws. *Riverside v. Rivera*, 477 U.S. 561, 574-5 (1986) ("a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms...the damages a plaintiff recovers contributes significantly to the deterrence of civil rights violations in the future...a plaintiff who obtains relief in a civil rights lawsuit 'does so not for [her]self alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest importance.'")

As noted above, because of the significance of this case, legal and civil rights organizations from across the country supported the litigation through public statements and/or *amicus curiae* briefs in the U.S. Supreme Court litigation. Those groups included the Lawyers Committee for Civil Rights, the NAACP, National Employment Lawyers Association, the Mexican American Legal Defense and Education Fund, the National Asian Pacific American Legal Consortium, and the Puerto Rican Legal Defense and Education Fund. (*See* Affidavits of Janet Hill and Michael Foreman, Exs. F and G) As noted above, the U.S. Solicitor General's office also filed a separate brief and was ceded ten minutes to argue on behalf of the Plaintiffs' position. As also noted above, as a result of the Class Counsel's work in this case, race discrimination plaintiffs across the country have a four year statute of limitations for their claims, which both allows many otherwise untimely cases to be filed, as well as increasing potential damages for those plaintiffs.

(Exhibits C-H) Awarding reasonable fees and expenses to Counsel in this case promotes both the public policies underlying class actions, 42 U.S.C. Sec. 1981, and Title VII.

**G. The Requested Fee is Reasonable Under a Lodestar Approach**

Similarly, under a lodestar approach, the amount of fees to be awarded here is appropriate. Through the date of the filing of this petition, Class Counsel have invested time and money in this case valued at over $4,875,000.00 at lodestar rates. Counsel also anticipates that they will devote additional time valued at almost one hundred thousand more dollars during the remainder of this litigation, principally in administering the claims, finding missing class members, and dealing with the ever increasing number of deceased Plaintiffs and class members in the claims distribution process. Plaintiffs' counsels' requested rates are based on Ms. Caporusso actual billing rate, (Exhibit B) which is presumptively reasonable, *People Who Care v. Rockford,* 90 F.3d 1307, 1310 (7th Cir. 1996); *Gusman v. Unisys Corp.,* 986 F.2d 1146, 1150 (7th Cir. 1993), as well as the rates awarded to Class Counsel last year by this Court. (See also Exs. A, C, D, E, and I on the reasonableness of the requested rates) The award requested by the Class Counsel is 1.04 of the lodestar, which is appropriate given the risks assumed by Counsel.

Where the risk of litigation is high, and the Plaintiffs would have faced substantial difficulties in finding counsel, an upward adjustment in the lodestar is justified. In common fund cases, where there is risk of non-payment, the Seventh Circuit actually has mandated awards of a risk multiplier. *Florin,* 34 F.3d at 564 ("a risk multiplier is not merely available in a common fund case but mandated, if the court finds that counsel 'had no sure source of compensation for their services'") (quoting *In the Matter of Continental Illinois Securities Litigation,* 962 F.2d 566, 569 (7th Cir. 1992)). The need for a risk

multiplier is "acute in class action cases." *Florin,* 34 F.3d at 564, and should be higher where, as here, the case is "[a]n uphill fight."

The risk multiplier requested here is actually less than those awarded in other cases. *In Re Abbott Laboratories Securities Litigation,* 1995 WL 792083 (N.D. Ill. July 3, 1995) (finding 1.79 multiplier to be modest); *Davitt v. Information Resources Inc.,* 1995 WL 792083, *18 (N.D. Ill. April 19, 1995) (awarding 2 multiplier); *Guthrie County State Bank v. Mahlmann,* 869 F. Supp. 669 (N.D. Ill. 1993) (2 multiplier); *Harman v. Lyphomid,* 787 F. Supp. 772, 786 (N.D. Ill. 1992) (approving 2 multiplier as a check on percentage award); See also 3 Herbert Newberg & Alba Conte, Newberg on Class Actions, §14.03 at 14-5 (3rd ed. 1992) ("Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.").

Should the Court determine not to use a percentage method for calculating fees, Plaintiffs request that the Court apply a lodestar-with-multiplier approach instead. *Cook v. Neibert,* 142 F.3d 1004, 1012 (7th Cir. 1998); *McLendon v. Continental Group, Inc.,* 872 F. Supp. 142, 164 (D.N.J. 1994); *Bowen v. Southtrust Bank,* 760 F. Supp. 889, 894 (M.D. Ala. 1991). If the lodestar approach is used and amounts to less than one-third of the Settlement Common Fund, Plaintiffs also request that they be awarded the costs of administration of the settlement, as allowed by the settlement agreement.

WHEREFORE, for the reasons given above and in the attached documents, the amount of the fees and expenses sought by Class Counsel should be awarded in full.

Respectfully submitted,

[signature]

Attorney for Plaintiffs

H. Candace Gorman
Catherine Caporusso
542 S. Dearborn Suite 1060
Chicago, IL 60605

# *See Case File for Exhibits*